IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00500-DDD-MEH

DONELL L. BLOUNT, SR.,

      Plaintiff,

v.

C/O MARIN,
C/O ZENDEJAS,
C/O NORMAN,
CAPTAIN NORMAN MACINTOSH,
LT. CORREY HARRIS,
C/O BEAULIEU,
LT. CAMP, and
LT. KING,

      Defendants.

---

## ORDER AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Michael E. Hegarty, United States Magistrate Judge**.

Before the Court are a Motion for Summary Judgment filed by Defendants Marin, Norman MacIntosh, Harris, Camp, and King ("CDOC[1] Defendants")[2] (ECF 38), the CDOC Defendants' Motion to Apply Level 2 Restriction for Conventionally Submitted Video (ECF 65), and Plaintiff's Response and Motion to Strike Said Video, Affidavit of Kelli Reyes, and Reference to Them (ECF 70). Plaintiff Donell Blount ("Blount") initiated this lawsuit on February 19, 2019 then, at the Court's direction, filed the operative Amended Complaint on May 6, 2019, alleging three claims

---

[1] "CDOC" is the Colorado Department of Corrections.
[2] Defendants Zendejas and Beaulieu have not appeared in this case; the docket reflects that service of process was attempted by the U.S. Marshal, but unsuccessful on both parties. *See* ECF 15, 20, 30.

for relief: (1) deliberate indifference to serious medical needs in violation of the Eighth Amendment regarding a February 23, 2017 incident; (2) deliberate indifference to serious medical needs in violation of the Eighth Amendment regarding a July 10, 2017 incident; and (3) religious discrimination in violation of the First Amendment, RLUIPA, and Fourteenth Amendment (equal protection) regarding a September 15, 2017 incident. *See* Am. Compl., ECF 8. In response, CDOC Defendants filed an Answer (ECF 28), the Court set a discovery schedule (ECF 31, 32), and the parties proceeded with discovery.

CDOC Defendants filed the present motion for summary judgment on March 2, 2020, seeking summary judgment on all of Blount's claims, arguing they are entitled to qualified immunity. Following resolution of discovery issues and extensions granted for briefing, Blount filed a response on May 22, 2020 and CDOC Defendants filed a reply on June 30, 2020. With their reply, CDOC Defendants conventionally submitted a video and filed the present motion for level 2 restriction of that video, to which they attached an affidavit. Blount filed a response and the present motion asking the Court to strike the video and affidavit. The Court received no further briefing on these motions. For the following reasons, the Court respectfully recommends that the Honorable Daniel D. Domenico grant the motion for summary judgment. In addition, the Court will grant CDOC Defendants' motion for restriction and deny as moot Plaintiff's motion to strike.

<u>**MOTION FOR SUMMARY JUDGMENT**</u>

**I.      Findings of Fact**

The Court makes the following findings of fact viewed in the light most favorable to the Plaintiff, who is the non-moving party. Unless otherwise cited, these facts are undisputed for purposes of the present motion.

1.      At all relevant times, Blount was incarcerated in the CDOC at the Sterling Correctional Facility ("SCF") and the Buena Vista Correctional Complex ("BVCC").

2.      On February 23, 2017, Blount was exercising in the SCF west gym.

3.      At approximately 10:25 a.m. that day, Officer Georgiana Cendejas accidentally discharged "OC" (oleoresin capsicum) spray in the west gym office.  *See* Incident Report # 989457, ECF 38-2, Deposition of Donnell Blount, February 2, 2020 ("Blount Dep."), 10: 17-20, ECF 38-1.

4.      Blount did not ask any of the inmates in the gym for assistance after exposure to the OC spray; he believed there was nothing they could do to help him.  Blount Dep. 25: 17 – 26: 2.

5.      Blount approached Defendant Officer Norman outside of the west gym after the incident, informed Norman of his exposure to the OC spray, and expressed that he felt like he was having an asthma attack; Norman instructed Blount to return to the housing unit building.  *Id.* at 25: 10-15; 27: 24 – 28: 6.

6.      According to Norman, Blount approached him and asked to speak to a Shift Commander, then asked to go to medical without an explanation; Norman perceived no medical problem, so instructed Blount to "return to his unit and issue a kite if he needed medical care."  Affidavit of Webb Norman, March 12, 2020 ("Norman Aff."), ¶ 3, ECF 68-1.

7.      Around two minutes after his interaction with Norman, Blount approached Defendants Captain Macintosh and Officer Marin in the housing unit and informed them of his accidental exposure to OC spray.  *See* Incident Report # 989457 ("Marin Incident Report"), ECF 38-3; Incident Report # 989457 ("Macintosh Incident Report"), ECF 38-4; Affidavit of David Marin, March 2, 2020 ("Marin Aff."), at ¶ 3, ECF 38-5; Affidavit of Norman MacIntosh, February 28, 2020 ("MacIntosh Aff."), at ¶¶ 5, 6, ECF 38-6; Blount Dep. 26: 18-22; 28: 12-16.

8.    Defendant MacIntosh called the gym and was informed of an "accidental discharge of OC in the gym office."  MacIntosh Incident Report; MacIntosh Aff. at ¶ 7.  Before and during the call, Blount was talking loudly, saying that he "couldn't breathe" and was going to call his attorneys and sue for "violating [his] rights."  *Id.*  MacIntosh asked Blount whether he had an emergency inhaler; Blount responded that it was in his cell.  *Id.*

9.    Macintosh accompanied Blount to his cell so that Blount could obtain and use his emergency inhaler.  *See* MacIntosh Incident Report; Macintosh Aff. at ¶¶ 5, 6; Blount Dep. 27: 11-20.

10.   According to Defendants, Blount did not display symptoms that required medical attention, refused to go to medical after retrieving his inhaler, did not use the inhaler, and did not appear to be in any physical distress.  *See* MacIntosh Incident Report; Macintosh Aff. at ¶ 6; Marin Aff. at ¶ 3.

11.   According to Blount, he was exposed to the OC spray (Blount Dep. 10: 11-16), he was coughing and his "breathing was difficult" (*id.* at 28: 7-11); he used the inhaler when he found it in his cell (*id.* at 27: 11-17); the inhaler provided "little relief" (*id.*); and he repeatedly asked to go to medical but was refused (*id.* at 25: 1-15; 26: 18-24; 27: 18-23).

12.   On July 10, 2017, at approximately 7:30 p.m., Blount met with Defendant Lieutenant Harris and non-party Lieutenant Terrell regarding the cancellation of intramural softball games. *See* Blount Dep. 50: 7-23; Incident Report # 1031815 ("Terrell Incident Report"), ECF 38-7.

13.   During the July 10 conversation, Blount asked to have the softball games reinstated, but Terrell denied his request.  *See* Terrell Incident Report; Blount Dep. at 50: 2-6, 50: 18-25, 51: 1-9.

14.     After Terrell denied Blount's request to reinstate the softball games, Blount stood up to leave the office.  *See* Terrell Incident Report; Blount Dep. 51: 5-23.

15.     According to Blount, the conversation with Terrell was civil and he stood up to leave when he understood that his request was declined.  Blount Dep. 51: 5-23.

16.     According to Defendants, Blount became agitated, did not like Terrell's answer, and tried to leave.  *See* Terrell Incident Report; Incident Report # 1031815 ("Harris Incident Report"), ECF 38-8; Affidavit of Cecil Terrell, June 19, 2020 ("Terrell Aff."), at ¶ 3, ECF 68-2; Affidavit of Corey Harris, June 16, 2020 ("Harris Aff."), at ¶ 4, ECF 68-3.

17.     Harris forcefully ordered Blount to sit down a few times; Blount complied while retorting to Harris that "yelling at me to sit down . . . that's not going to make me respect you." Blount Dep. 51: 24 – 52: 13; Ex. 8, Harris Incident Report.

18.     According to Defendants, Harris responded by standing up and moving toward Blount, which caused Blount to stand, take an aggressive stance, and ball his fist. *See* Terrell Incident Report; Harris Incident Report; Terrell Aff. at ¶ 5; Harris Aff. at ¶ 4.

19.     According to Blount, Harris "became enraged, jumped up from his seat, charged towards [him], and [Blount] stood up."  Blount Dep. 52: 14-15.

20.     Harris perceived Blount's stance as aggressive and a threat and directed Blount to turn around to be restrained.  *See* Terrell Incident Report; Harris Incident Report; Harris Aff. at ¶ 4.

21.     According to Defendants, Blount resisted; thus, Harris physically directed Blount to the office wall to apply wrist restraints. *See* Terrell Incident Report; Harris Incident Report; Harris Aff. at ¶ 4.

22.     According to Blount, Harris immediately grabbed Blount's left arm, yanked and turned him around, and pushed him up against a coat rack.  Blount Dep. 52: 15-18.

23.     While being handcuffed, Blount asked why he was being handcuffed and complained that a coat hook, which protruded from the office wall, was "digging in [his] stomach" and that the handcuffs were too tight.  Blount Dep. at 53: 4-13; 58: 8-11.

24.     Blount remained pressed against the coat hook for "[m]aybe a minute."  *Id.* at 53:11-12.

25.     Blount claims that the coat hook bruised his abdomen "[v]ery bad" (*id.* at 58: 2-7) and attested that the bruise was "about a nickel size or a little bit bigger than a nickel."  *Id.* at 58: 19 – 59: 3.

26.     The abdomen bruising and the pain from the tight handcuffs were Blount's only injuries from being pushed up against the wall on July 10, 2017.  *See id.* 59: 6-10.

27.     According to CDOC Administrative Regulation 800-01, "[r]eligious head coverings may be worn under either a baseball cap or a stocking cap while outside the cell or religious service provided that the head covering is not visible."  *See* AR 800-01(IV)(R)(7), ECF 38-10.

28.     On October 3, 2017, while walking in the corridor outside Dining Hall 2 at the BVCC, Defendant Captain King encountered Blount and noticed that his kufi was hanging below his baseball cap by about a half an inch to an inch.  *See* Affidavit of Capt. Andrew King, February 28, 2020 ("King Aff."), at ¶ 4, ECF 38-11; ECF 55 at 27.

29.     According to King, during that encounter he reminded Blount that, per CDOC policy, a kufi must not be visible from underneath a baseball cap if the offender is not in his unit or is not in a religious service.  *See id.*

30.     King states he advised Blount that he had one of two options: (1) put the kufi away; or (2) wear it properly; otherwise, King would confiscate it.  *See id.* at ¶ 6.

31.     King also states that he neither confiscated Blount's kufi nor demanded that he surrender it; instead, Blount voluntarily removed his kufi, gave it to King, and stated that he would see King in court.  *See id.*; *see also* ECF 55 at 27.

32.     King attests that a few days prior to his encounter with Blount, King observed Defendant Lieutenant Jeffrey Camp counsel Blount about the visibility of Blount's kufi.  King Aff. at ¶ 5; Affidavit of Jeffrey Camp, February 27, 2020 ("Camp Aff."), at ¶ 4, ECF 38-12.

33.     According to Blount, King and Camp confronted him together on September 30, 2017, confiscated the kufi saying they knew Blount had a "well-publicized" lawsuit against the CDOC and saw the legal mail package Blount received from his attorney the day before, and refused to return the kufi when Blount later asked for it.  Am. Compl. ¶¶ 8-10; Plaintiff's Declaration, May 12, 2020 ("Plaintiff's Decl.") at ¶ 5, ECF 55 at 18.

34.     King and Camp attest they were unaware of Blount's lawsuits against other CDOC employees, his representation by an attorney in any of those lawsuits, or his receipt of legal mail from his attorney.  *See* King Aff. at ¶ 7; Camp Aff. at ¶ 6.

35.     King attests that he kept Blount's kufi in his desk drawer but disposed of it after Blount failed to reclaim the kufi within 21 days and after he learned that Blount was transferred to a facility outside the state.  *See* King Aff. at ¶ 8.

36.     Responses to Blount's grievances regarding the September 30, 2017 kufi incident, dated October 25, 2017 and December 22, 2017, informed Blount of how he could obtain his kufi—i.e., by requesting it from King. *See id.* at ¶ 9; see also Steps 2 and 3 Grievance Responses, ECF 38-13.  King attests that Blount never requested the kufi from him.  King Aff. at ¶ 9.

37.     After his incarceration at BVCC from September 15, 2017, to November 21, 2017, Blount was incarcerated at other CDOC facilities until August 27, 2018, at which time he was transferred to the Virginia Department of Corrections. *See* Offender Movement Query, ECF 38-14.

38.     Before Blount arrived at the Virginia Department of Corrections, he possessed the following religious items: tikka beads, a prayer book, books on loan, and various forms of literature.  Blount Dep. at 107: 7-11.

39.     Blount believes that, as a Muslim, he must cover his head "as much as possible" when he prays.  *Id.* at 107: 22 – 108: 4.

40.     Because Blount did not have a kufi, he covered his head with a "cap-like do-rag."  *Id.* at 108: 8-12.

## II.     Legal Standards

### A.     Fed. R. Civ. P. 56

A motion for summary judgment serves the purpose of testing whether a trial is required.  *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).  A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal citations and quotation marks omitted).

It is the movant's burden to demonstrate that no genuine dispute of material fact exists for trial, whereas the nonmovant must set forth specific facts establishing a genuine issue for trial. *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  The moving party bears the initial

responsibility of providing to the court the factual basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the moving party has the burden of proof—the plaintiff on a claim for relief or the defendant on an affirmative defense—his[, her, or its] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party."  *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined.  *Celotex*, 477 U.S. at 322.  That is, the opposing party may not rest on the allegations contained in his complaint but must respond with specific facts showing a genuine factual issue for trial.  Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002).  These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'"  *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324); *see also Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1170 (10th Cir. 2010) ("On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings  and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment.") (quoting *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)).

In considering the evidence, the court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165-66 (10th Cir. 2008).

Further, the court may consider only admissible evidence, *see Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995), though the evidence need not be in a <u>form</u> that is admissible at trial; only the <u>content or</u> <u>substance</u> must be admissible at trial, *see Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) ("The requirement is that the party submitting the evidence show that it will be possible to put the information, the substance or content of the evidence, into an admissible form.") (citation omitted).  Indeed, "[t]o determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury." *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005); *see also Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1236 (10th Cir. 2016).

      B.     <u>Treatment of a Pro Se Plaintiff's Pleadings</u>

A pro se plaintiff's "pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)). "Th[e] court, however, will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on plaintiff's behalf." *Smith v. United States*, 561 F.3d 1090, 1096 (10th Cir. 2009) (quoting *Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997)). The Tenth Circuit interpreted this rule to mean, if a court "can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, [it] should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." *Diversey v.*

*Schmidly*, 738 F.3d 1196, 1199 (10th Cir. 2013) (quoting *Hall*, 935 F.2d at 1110).  However, this interpretation is qualified in that it is not "the proper function of the district court to assume the role of advocate for the pro se litigant." *Garrett*, 425 F.3d at 840 (quoting *Hall*, 935 F.2d at 1110).

## III.   Analysis

The CDOC Defendants, in their individual capacities, base their request for summary judgment on the doctrine of qualified immunity, which protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly a violation at the time of the official's actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Because qualified immunity is an immunity from suit, rather than a mere defense to liability, it is effectively lost if a case is erroneously permitted to go to trial. *Id*. at 231; *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006) ("The privilege is an immunity from suit rather than a mere defense to liability.").  The "driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery." *Pearson*, 555 U.S. at 231-232 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, n.2 (1987)).  Accordingly, qualified immunity questions must be resolved at the earliest possible stage in litigation." *Id*. at 232.

When a defendant asserts the defense of qualified immunity at summary judgment, the plaintiff has a two-fold burden to overcome the asserted immunity: (1) "rebut the [defendant's] non-constitutional-rights arguments"; and (2) "demonstrate that any constitutional violation was grounded in then-extant clearly established law." *Cox v. Glanz*, 800 F.3d 1231, 1245 (10th Cir.

11

2015) (citing *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009)); *see also Felders v. Malcom*, 755 F.3d 870, 877–78 (10th Cir. 2014) ("[T]he 'record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.'"), *cert. denied*, ⸺ U.S. ⸺, 135 S. Ct. 975, 190 L. Ed. 2d 890 (2015).  An official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  To satisfy the clearly established prong of the test, the Tenth Circuit requires that "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010); *see also Farrell v. Montoya*, 878 F.3d 933, 936–37 (10th Cir. 2017).

Traditionally, there has been a two-step process for resolving qualified immunity questions: "First, a court must decide whether the facts that a plaintiff has alleged…or shown…make out a violation of a constitutional right…Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (quoting *Saucier v. Katz*, 533 U.S. 194 (2001) (internal citations and quotation marks removed)).  However, the Supreme Court has afforded courts the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236; *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).  Here, the Court will begin by determining whether Blount raises genuine issues of material fact as to each constitutional claim.

A.   Claim One: Deliberate Indifference on February 23, 2017

Blount attests that he is a "lifelong asthmatic," who was "overcome" by OC gas dispersed by Defendant Zendejas, which drifted from the gym's office into the "weight area" and caused him "to have coughing spasms; burning of his nose, throat, eyes, [and] skin; and difficulty breathing."  Am. Compl. at ¶ 2.[3]  Blount asserts that CDOC Defendants Norman, Marin, and MacIntosh violated his Eighth Amendment right against deliberate indifference to a serious medical need by "refusing" to send Blount to "medical" for breathing treatments or other care.

A prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment.  *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (citing *Estelle v. Gamble*, 429 U.S. 97, 104–105 (1976)). The Supreme Court held that deliberate indifference occurs when prison officials deny or delay an inmate's access to needed medical care (i.e., when they fail to fulfill their "gatekeeper" roles).  *See id.*  "The test for constitutional liability of prison officials 'involves both an objective and a subjective component.'"  *Id.* (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

To avoid summary judgment, the prisoner must first produce objective evidence that the deprivation at issue was in fact "sufficiently serious." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  A "medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Id.* (citing *Sealock*, 218 F.3d at 1209).  A delay in medical care "only constitutes an Eighth Amendment violation where the plaintiff can show the

---

[3] For adjudication of a summary judgment motion, the Tenth Circuit has approved consideration of a complaint to which a prisoner plaintiff has sworn under penalty of perjury. *See Ali v. Dinwiddie*, 437 F. App'x 695, 697 n.4 (10th Cir. 2011); *Green v. Branson*, 108 F.3d 1296, 1301 (10th Cir. 1997).

delay resulted in substantial harm." *Id.* (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)). The substantial harm requirement "may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Id.* (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).

For the subjective prong, the prisoner must present evidence of the prison official's culpable state of mind. *Id.* (citing *Estelle*, 429 U.S. at 106).  The subjective component is satisfied if the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Id.* (quoting *Farmer*, 511 U.S. at 837). A prison official who serves "solely ... as a gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if he or she "delays or refuses to fulfill that gatekeeper role." *Id.* (quoting *Sealock*, 218 F.3d at 1211); *see also Estate of Booker v. Gomez*, 745 F.3d 405, 430–31 (10th Cir. 2014) (applying the "gatekeeper" standards from *Mata* to a deliberate-indifference claim alleging sheriff's deputies used force on a detainee, then delayed getting the detainee medical treatment).

CDOC Defendants concede that an "asthma attack is a sufficiently serious medical need." They argue, however, that Blount displayed no symptoms "that would enable Defendants . . . or any other lay person to easily recognize [Blount's] need for a doctor's attention" and, thus, "no reasonable juror could find that Defendants . . . knew of and disregarded an excessive risk" to Blount's health.  Mot. at 10.  Blount counters that he "did display symptoms of exposure to OC gas while he spoke with Defendants" (Resp. at 2); in his verified Amended Complaint and deposition, Blount attested that he was exposed to the OC spray (Blount Dep. 10: 11-16), he was coughing and his "breathing was difficult" (*id.* at 28: 7-11); he used the inhaler when he found it

14

in his cell (*id.* at 27: 11-17); the inhaler provided "little relief" (*id.*); and he repeatedly asked to go to "medical," but Defendants refused his request (*id.* at 25: 1-15; 26: 18-24; 27: 18-23).

Here, the record reflects that Blount suffers from asthma, OC spray was accidentally dispersed in the west gym where Blount was using weights, he told Defendants Norman, Marin, and MacIntosh that he had been exposed and was having asthma symptoms, and Blount possessed an emergency inhaler for his asthma. The Court finds first that the record demonstrates Defendants did not deny Blount *any* medical treatment; it is undisputed that MacIntosh and Marin accompanied Blount to his cell to retrieve his rescue inhaler. Am. Compl. at ¶ 4. Blount asserts that he used the inhaler and it provided him "little relief"; at that point, Blount asserts that he asked Marin and MacIntosh "to get him medical care" but "they refused." *Id.*

For the subjective prong, Blount must present evidence demonstrating Defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Mata*, 427 F.3d at 751. "Deliberate indifference requires that the defendant's conduct is 'in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow,' or that the conduct 'disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights.'" *Verdecia v. Adams*, 327 F.3d 1171, 1175–76 (10th Cir. 2003) (quoting *Berry v. City of Muskogee*, 900 F.2d 1489, 1494 (10th Cir. 1990)).

While Blount attests that he was having difficulty breathing and his nose, throat, and skin were burning, he provides no evidence that Defendants Norman, Marin, or MacIntosh disregarded a "known or obvious" risk of serious harm; for example, there are no allegations that other persons (i.e., inmates or other correctional officers) recognized that Blount was suffering symptoms or having difficulty breathing nor evidence that Blount was unable to talk, walk, or otherwise function

in a way that would make his symptoms obvious to an observer and were "so great as to make it highly probable that harm would follow" if he received no medical attention.  *See id.[4]*

 Although Blount has demonstrated factual issues as to whether he displayed symptoms or was actually suffering an asthma attack and whether Defendants refused Blount's requests for medical attention, the Court finds these are insufficient to raise material questions as to whether Defendants were deliberately indifferent to Blount's serious medical need in violation of the Eighth Amendment.  Accordingly, the Court recommends that Judge Domenico find the CDOC Defendants are entitled to qualified immunity and grant their motion for summary judgment with respect to Blount's first claim for relief.

 B. Claim Two: Excessive Force on July 10, 2019

 Blount alleges that CDOC Defendant Harris "shoved" Blount against an "office wall and coat rack causing the [coat] hook to stab into his abdominal area and clamped handcuffs on his wrists so tight they dug to the bone."  Am. Compl. at ¶ 6.  At his deposition, Blount explained that he was in the office discussing with Lieutenant Terrell the decision to cancel the inmates' weekend intramural sport—softball—when Blount got up to leave; Harris ordered Blount to sit down several times, Blount complied with a comment about Harris yelling at him, Harris "became enraged" and "charged" toward Blount, yanked him around, and shoved Blount against the wall and coat rack. Blount Dep. 51: 24 – 52: 15.

 "[A]n excessive force claim involves two prongs: (1) an objective prong that asks if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and (2)

---

[4] Blount concedes that Marin and MacIntosh were not trained in medicine but argues "even if their untrained eyes could not see the asthma symptoms . . . they were train[ed] to know that OC gas does burn the eyes, nose, throat, and skin."  Resp. at 9.  Even if this is true, Blount has failed to demonstrate how exposure to OC spray, itself, is objectively "serious" for an Eighth Amendment claim.

a subjective prong under which the plaintiff must show that the officials acted with a sufficiently culpable state of mind." *Redmond v. Crowther*, 882 F.3d 927, 936 (10th Cir. 2018) (quoting *Giron v. Corr. Corp. of America*, 191 F.3d 1281, 1289 (10th Cir. 1999)). An official has a culpable state of mind if he uses force "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline." *Id.* To determine whether prison officials applied force maliciously and sadistically or, rather, in good faith, courts should consider (1) the need for the force, and (2) whether the officers used a disproportionate amount of force. *Id.* at 937 (citing *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).

Here, the undisputed evidence indicates that while in the office, Blount stood up to leave and Harris instructed him to sit down.  Blount Dep. 51: 10-16.  Harris then said, "I asked you to sit down." *Id.* at 51: 24-25.  Blount asked, "why?" *Id.* at 52: 1.  Harris "again" instructed Blount to sit down. *Id.* at 52: 2; Plaintiff's Decl. at ¶ 4.  Blount looked at another officer, Sergeant Henson, who gestured for Blount to sit down.  Blount Dep. 52: 3-5.  Blount sat back down and told Harris, "Yelling at me to sit down extremely . . . that's not going to make me respect you." *Id.* at 52: 8-13.  Blount attests that Harris "charged towards" him and Blount stood up again. *Id.* at 52: 14-15.[5] The Court finds this evidence demonstrates Blount disobeyed Harris' orders to sit and necessitated an "effort to maintain or restore discipline." *See Redmond*, 882 F.3d at 938 (prisoners "cannot be permitted to decide which orders they will obey, and when they will obey them").

---

[5] Blount attaches a form titled "Department of Corrections Evaluation to Determine Dangerousness and Reliability of Confidential Information," dated July 31, 2017, on which Blount has highlighted the following note by Disciplinary Officer Lt. Reeves, who describes what appears on a video dated July 10, 2017: "Lt. Harris comes into view and is removing his handcuffs while approaching Offender Blount. Offender Blount stands up and Lt. Harris grabs his left wrist and places him against the windows at the coat rack."  ECF 55 at 23.

Thus, the Court must determine whether Blount has raised material factual issues as to whether Harris' conduct in "shoving" Blount against the wall/coat rack and handcuffing him "tightly" was "objectively harmful enough to establish a constitutional violation" and whether Harris used a "disproportionate amount of force" against Blount.  *Id.* at 936.  When prison officials must act to "preserve internal order and discipline," courts should afford them "wide-ranging deference."  *Id.* (quoting *Whitley*, 475 U.S. at 320–21).  This deference "does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice."  *Id.* (quoting *Whitley*, 475 U.S. at 322).

Not "every malevolent touch by a prison guard gives rise to a federal cause of action."  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'"  *Id.* at 9-10 (quoting *Whitley*, 475 U.S. at 327).  "Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society," only those physical punishments rising above de minimis uses of force "are sufficiently grave to form the basis of an Eighth Amendment violation."  *Id.* (citations omitted).  Although not dispositive, "the extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation."  *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson*, 503 U.S. at 7).  The extent of injury may also provide some indication of the amount of force applied.  *Id.*; *see also Northington v. Jackson*, 973 F.2d 1518, 1523 (10th Cir. 1992) (holding that a showing of "significant physical injury" is not required, but "[t]he extent

of injury may be relevant in determining whether corrections officers unnecessarily and wantonly inflicted pain").

While "blows" that "caused bruises, swelling, loosened teeth, and a cracked dental plate are not de minimis for Eighth Amendment purposes" (*Hudson* 503 U.S. at 10), the Court finds Harris' conduct—in response to Blount's repeated disobedience to Harris' orders—in "grabbing" Blount's arm, "yanking" Blount around, and "shoving" him against a coat hook on the wall, which caused a nickel-sized bruise on Blount's abdomen, and Harris' application of "tight" handcuffs causing Blount "extreme pain" do not demonstrate the type of objective harm—i.e., that which is "repugnant to the conscience of mankind"—and disproportionate use of force necessary to state an Eighth Amendment claim. *See, e.g., Marshall v. Milyard*, 415 F. App'x 850, 852-53 (10th Cir. 2011) (finding the force allegedly used against the plaintiff was "de minimis and not of a nature that was repugnant to mankind" where a prisoner alleged that he (1) was told to lock down in his cell, (2) questioned the prison guard but began walking toward his cell, (3) the prison guard grabbed his arm forcefully, put him in handcuffs, and dug his fingernails into the prisoner's arm, and (4) the prisoner suffered redness and bruising as indicated by a medical form); *Norton v. City of Marietta*, 432 F.3d 1145, 1156 (10th Cir. 2005) (prison guards' alleged actions were not "objectively harmful enough to establish a constitutional violation" where they injured a prisoner by grabbing him around his neck and twisting it); *Stanton v. Furlong*, 73 F. App'x 332, 334 (10th Cir. 2003) (finding no excessive force where prisoner verbally threatened corrections officer and suffered "two abrasions and some slight edema" from handcuffs applied too tightly); *cf. Wilkins*, 559 U.S. at 38 (Court overturned dismissal of claim alleging plaintiff suffered "a bruised heel, back pain, and other injuries requiring medical treatment" after he was "punched, kicked, kneed, choked, and body slammed" "maliciously and sadistically" and "[w]ithout any provocation").

The Court recommends that Judge Domenico find Blount has failed to raise genuine issues of material fact as to whether excessive force was used, determine that Defendant Harris is entitled to qualified immunity, and grant Harris' motion for summary judgment with respect to Blount's second claim for relief.

C.      Claim Three: First/Fourteenth Amendment Violations on September 30, 2017

Blount alleges that, as a follower of the Islamic faith, he requires a "kufi" to cover his head during prayer.  He asserts that on September 29, 2017, he received by mail a large package from his attorney concerning a civil action pending in federal court.  Am. Compl. at ¶ 9.  The following day, September 30, 2017, Blount was exiting the chow hall when he was confronted by CDOC Defendants King and Camp, who told him he was not allowed to wear his kufi because they were aware of his lawsuit and the legal mail he received, and they confiscated the kufi from him.  *Id.* According to Blount, he later followed instructions to ask Defendants to return the kufi, but they refused.  *Id.* at 10.  Based on these allegations, Blount asserts claims for retaliation in violation of his right to access the courts, a violation of his right to freedom of religion, and a violation of his right to equal protection of the law.

King and Camp attest that they each spoke with Blount at different times, reminding Blount of the regulation that a religious head covering must be worn under a hat or cap when the inmate is not in his cell or at a religious service.  King asserts that he had seen Camp counsel Blount about the regulation "a few days prior" to his encounter with Blount.  King states that, rather than fix the kufi, Blount took off his cap, handed the kufi to King, and said, "I'll see you in court."  During the grievance process regarding the encounter, Blount was instructed to ask King for return of the kufi; King attests Blount did not do so.  King kept the kufi in his possession until he learned that Blount had left the state.

20

       1.     Retaliation

CDOC Defendants argue that Blount fails to demonstrate any genuine issues of material fact as to whether King or Camp was motivated to confiscate his kufi in retaliation for his pending litigation against the CDOC.  Blount counters that King and Camp told him on September 30, 2017 when they confiscated his kufi that they knew about the pending litigation.

"It is well-settled that prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his right of access to the courts."  *Requena v. Roberts*, 893 F.3d 1195, 1211 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 800, 202 L. Ed. 2d 589 (2019) (quoting *Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2010) (brackets and quotation marks omitted)). "Government retaliation against a plaintiff for exercising his or her First Amendment rights may be shown by proving the following elements: (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct."  *Id.* (quoting *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007)).

CDOC Defendants do not dispute that participating in litigation is a constitutionally protected activity.  They contend that Blount fails to proffer specific facts showing King and Camp were motivated by his pending litigation to confiscate his kufi and refused to return it.  Blount attests that Camp and King told him they not only knew about the litigation, but also that he received mail from his attorney the previous day.  Even if the Court were to find Blount's testimony sufficient itself to demonstrate a material factual issue as to King and Camp's motivation and whether they actually confiscated the kufi or Blount handed it over saying, "I'll see you in court,"

the Court finds Blount fails to demonstrate specific facts supporting the second element of the claim: that confiscation of a kufi would chill a Muslim of ordinary firmness from continuing to engage in litigation against the facility.

A de minimis injury will not support a First Amendment retaliation claim. *Shero*, 510 F.3d at 1203. This is especially true in the prison setting, where courts generally require a greater showing of injury. *Chrisco v. Koprivnikar*, No. 16-cv-01553-MEH, 2017 WL 1344450, at *3 (D. Colo. Apr. 12, 2017) (citing *Poole v. County of Otero*, 271 F.3d 955, 961 (10th Cir. 2001), *abrogated on other grounds by Hartman v. Moore*, 547 U.S. 250 (2006)). Here, it is undisputed that Blount was informed at least twice during the grievance process that he could simply request from King that his kufi be returned. ECF 38-13 at 1 ("You can speak with the staff member who you gave your kufi to and request it be returned.") and 3 ("If you still want the kufi returned you need to write to Capt. King at BVCF and make the request for the kufi within thirty days of the date of this letter."). Blount attaches his own declaration to the briefing here stating in broad terms that he asked for the kufi's return but King refused. Plaintiff's Decl. at ¶ 6 ("My requests for the return of my kufi have been denied since 9/30/17."). However, Blount points to nothing in his own grievances or in any other document showing that he, in fact, made a request to King for the kufi's return in 2017 or 2018, but the request(s) were refused. *See* ECF 38-13.

Moreover, Blount testified at his deposition that, during prayer, it was "obligatory" that he cover his head, but conceded that in prison sometimes he could not, and advised that he used a "cap-like do-rag" when he did not have his kufi. Blount Dep. 107: 22 – 108: 12. When Blount was transferred outside of Colorado and arrived at the Virginia Department of Corrections the following year, he had in his possession the following religious items: tikka beads, a prayer book,

22

and various other forms of literature. *Id.* 107: 2-11. This evidence does not demonstrate that Blount was "chilled" from participating in litigation by the absence of his kufi.

Furthermore, although not dispositive, persistence in constitutionally protected conduct is some evidence that the defendant's actions would not prevent such conduct. *See Smith v. Plati*, 258 F.3d 1167, 1177 (10th Cir. 2001) ("Smith's persistence in maintaining his website offers some evidence that Plati's actions did not prevent such private speech."); *How v. City of Baxter*, 217 F. App'x 787, 798 (10th Cir. 2007) (defendant entitled to qualified immunity on the plaintiff's First Amendment retaliation claim, in part, because the plaintiff "continued to exercise his First Amendment rights thereafter . . . ."). Here, it is undisputed that after King had possession of Blount's kufi, Blount continued to file lawsuits, such as the present case. *See also Blount v. Younger, et al.*, No. 19-cv-02134-DDD-MEH (D. Colo. July 24, 2019). This provides further support for a conclusion on the evidence proffered that the confiscation of a kufi would not dissuade a Muslim of ordinary firmness from continuing to participate in pending litigation against the facility.

This Court recommends that Judge Domenico find King and Camp are entitled to qualified immunity with respect to Blount's claim for retaliation in violation of the First Amendment.

2.      Religious Discrimination

The Supreme Court has affirmed that "[i]nmates . . . retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *See Rojas v. Heimgartner*, 604 F. App'x 692, 694 (10th Cir. 2015) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987)). However, "a prison regulation imping[ing] on inmates' constitutional rights . . . is valid if it is reasonably related to legitimate penological interests." *Id.* To state a claim for a free exercise violation, a prisoner must show that a prison regulation

"substantially burdened . . . sincerely-held religious beliefs." *Id.* (quoting *Boles v. Neet*, 486 F.3d 1177, 1182 (10th Cir. 2007)).  Once the prisoner has made this showing, "the question of whether a prison regulation reasonably curtails constitutional rights requires close examination of the facts . . . , the specific regulation under review, and the alleged justifications for it." *Id.*  In making this determination, courts should consider:

> (1) whether a rational connection exists between the prison policy regulation and a legitimate governmental interest advanced as its justification; (2) whether alternative means of exercising the right are available notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights.

*Id.* (quoting *Kay v. Bemis*, 500 F.3d 1214, 1219 (10th Cir. 2007)).

CDOC Defendants contend that Blount has failed to demonstrate material factual issues as to whether its regulation concerning religious head coverings or King and Camp's conduct in allegedly confiscating Blount's kufi "substantially burdened" Blount's sincerely held religious beliefs.  Blount attests that "[n]othing can replace a kufi as proper headgear to fulfill [his] religious beliefs."  Plaintiff's Decl. at ¶ 10.

A substantial burden under the First Amendment is one that "(1) significantly inhibits or constrains a plaintiff's religious conduct or expression, (2) meaningfully curtails a plaintiff's ability to express adherence to his faith, or (3) denies the plaintiff reasonable opportunity to engage in fundamental religious activities." *Sutton v. Hydenthal*, No. 17-cv-02191-RM-NRN, 2020 WL 555420, at *4 (D. Colo. Jan. 3, 2020), *report and recommendation adopted*, 2020 WL 550590 (D. Colo. Feb. 4, 2020) (quoting *Mares v. LePage*, No. 16-cv-03082-RBJ, 2018 WL 1312814, at *3 (D. Colo. Mar. 13, 2018)).

The Court notes first that Blount does not appear to challenge the CDOC's regulation restricting prisoners from wearing their religious head coverings in a way that makes them

24

"visible." Rather, he focuses on King and Camp's "confiscation" of his kufi as having burdened his religious beliefs. But, other than the broad statement in his declaration, Blount does not explain *how* he was burdened by the absence of the kufi. As set forth above, Blount testified that it was several months during which he was without a kufi and he used a "do-rag" to cover his head during prayer. *See Rojas*, 604 F. App'x at 694 (facility's action in permitting plaintiff to wear white, as opposed to colored, bandanas on his head to worship service constituted reasonable alternative). Without an explanation as to how the absence of a kufi burdened his ability to pray/worship, Blount's stated desire to wear a kufi as opposed to another head covering is insufficient to establish the first element of a Free Exercise claim. *See Sutton*, 2020 WL 555420, at *5 (finding that, even if Muslim inmates were required to remove their kufis, plaintiff failed to allege how the requirement affected his ability to worship); *see also Sealock*, 218 F.3d at 1209 (a plaintiff must "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment."). The Court concludes that Blount has failed to demonstrate material factual issues as to whether King and Camp's conduct substantially burdened his sincerely held religious beliefs and recommends that Judge Domenico find King and Camp are entitled to qualified immunity with respect to Blount's Free Exercise claim.

### 3.      Equal Protection

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (internal quotation marks omitted). "[T]o assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were treated

differently from others who were similarly situated to them." *Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998). That is, to state a "class of one" equal protection claim, a plaintiff must prove that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Blair v. Raemisch*, 804 F. App'x 909, 920 (10th Cir. 2020) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)). Thus, Blount must point to facts establishing that others who were "similarly situated in every material respect were treated differently," and that "this difference in treatment was without rational basis, that is, . . . [it] was irrational and abusive, and wholly unrelated to any legitimate state activity." *Id.* (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216 (10th Cir. 2011)).

Here, Blount alleges, "Prisoners and staff members at BVCC are allowed to wear and display their non-Islamic faith symbols/items (i.e., wedding rings, tattoos) openly." Am. Compl. at ¶ 11; *see also* Resp. at 14. The Court finds this statement insufficient to raise genuine issues of material fact as to whether Blount was treated differently than similarly situated prisoners. First, Blount fails to point to material facts demonstrating that a prisoner wearing a wedding ring is "similarly situated in every material respect" to a Muslim prisoner obligated (in his words) to wear a kufi. Second, Blount fails to raise any factual issues as to whether and how the CDOC's restriction on wearing religious head coverings or King and Camp's application of the regulation was "irrational and abusive and wholly unrelated to any legitimate state activity." The Court finds Plaintiff has failed to identify facts that "make out a violation of a constitutional right" (*Pearson*, 555 U.S. at 232) and King and Camp are entitled to qualified immunity from Blount's equal protection claim. As such, this Court recommends that Judge Domenico grant the motion for

summary judgment.  *See Blair*, 804 F. App'x at 920 (plaintiff's allegations were too vague and incomplete to state a plausible equal protection claim).

## IV.    Conclusion

The Court concludes that Blount has failed to raise genuine issues of material fact as to whether the CDOC Defendants violated his constitutional rights.   Therefore, this Court respectfully recommends that Judge Domenico **grant** the CDOC Defendants' Motion for Summary Judgment [filed March 2, 2020; ECF 38].[6]

### REMAINING MOTIONS

With their reply brief in support of the motion for summary judgment, the CDOC Defendants proffered evidence in the form of a video and an affidavit authenticating both the video and copies of photographs submitted with the motion.  See ECF 67, 68.  Defendants moved for Level 2 restriction of the video asserting that security concerns require that the video be kept confidential from Blount and the public.  *See* ECF 65.  In response, Blount filed a motion to strike both the video and the affidavit, arguing that the video is either incomplete or "edited" and that the affiant had no personal knowledge of the events captured on the recording.  *See* ECF 70.

---

[6] Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.  Fed. R. Civ. P. 72.  The party filing objections must specifically identify those findings or recommendations to which the objections are being made.  The District Court need not consider frivolous, conclusive or general objections.  A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a de novo determination by the District Judge of the proposed findings and recommendations.  *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1).  Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted or adopted by the District Court.  *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)).

The Court finds Defendants' stated security concerns demonstrate an interest that outweighs the presumption of public access and identify a clearly defined and serious injury that would result if access to the video is not restricted. Therefore, the Court **grants** Defendants' Motion to Apply Level 2 Restriction to Conventionally Submitted Video [filed June 29, 2020; ECF 65] and directs the Clerk of the Court to maintain the evidence located at ECF 67 under Level 2 Restriction until further order of the Court.

With respect to Blount's motion, the Court did not consider, for purposes of the within analysis, either the video or the photographs to which the affidavit is directed. Therefore, Plaintiff's Motion to Strike [Conventionally Submitted] Video and Affidavit of Kelli Reyes [filed July 9, 2020; ECF 70] is **denied as moot**.

Respectfully submitted at Denver, Colorado, this 2nd day of September, 2020.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge